E-FILED
Thursday, 20 September, 2007  09:20:17 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HARRY M. SCHMIDT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-3069 |
| | ) | |
| UNITED STATES AIR FORCE, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter is before the Court on cross motions for summary judgment.  Defendant's Motion for Summary Judgment (d/e 6); Plaintiff's Cross-Motion for Summary Judgment (d/e 8).  In 2006, Major Harry M. Schmidt of the Illinois Air National Guard filed a two-count Complaint (d/e 1) against the United States Air Force, seeking declaratory relief and damages pursuant to the Privacy Act, 5 U.S.C. § 552a.  For the reasons set forth below, Defendant's Motion for Summary Judgment is allowed, and Plaintiff's Cross-Motion for Summary Judgment is denied.

### BACKGROUND

Major Schmidt is a graduate of the U.S. Naval Academy.  In 2001,

after serving for several years as an F-18 pilot and instructor, Schmidt left the Navy for a full-time position with the Illinois Air National Guard's 170th Fighter Squadron.  Schmidt served as the Squadron's weapon and tactics officer and a fighter weapons instructor.

In March 2002, the 170th Fighter Squadron was deployed to Southwest Asia in support of Operation Enduring Freedom.  Operation Enduring Freedom included military operations in Afghanistan and was begun in response to the terrorist attacks of September 11, 2001.  Major William Umbach served as the deployed Squadron Commander.

On April 17, 2002, Major Schmidt and Major Umbach were flying a mission, during which Umbach was acting as the flight lead.  At the same time, unbeknownst to Schmidt and Umbach, members of the Canadian Light Infantry were conducting a nighttime live-fire exercise at a firing range at the former headquarters of Osama Bin Laden, an area known as Tarnak Farms.  Major Schmidt and Major Umbach reported that they observed surface to air fire in the Tarnak Farms' area.  Major Schmidt believed that Major Umbach had been engaged by a surface to air weapon system.  As a result, Major Schmidt declared that he was engaging the ground target in "self-defense" and dropped a laser guided bomb on the source of the

perceived surface to air fire.  The bomb killed several members of the Canadian Light Infantry who were involved in the night live-fire training, and it injured several others.

The Air Force investigated the friendly-fire incident and, in September 2002, initiated criminal charges under the Uniform Code of Military Justice (UCMJ) against Major Schmidt and Major Umbach.  Beginning in September 2002, Major Schmidt was represented by Lieutenant Colonel Clayton Moushon, Staff Judge Advocate at the 183rd Fighter Wing.  Major Schmidt also retained a civilian attorney, Charles Gittins, to aid in his defense.  A public hearing/investigation pursuant to Article 32 of the UCMJ was held during January 2003.  See 10 U.S.C. § 832.[1]  The Article 32 hearing was generally open to the public with minor exceptions involving discussions of classified information.  During the Article 32 hearing, the Public Affairs Office at Barksdale Air Force Base set up a media facility to

---

[1]Under 10 U.S.C. § 832(a):

No charge or specification may be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made. This investigation shall include inquiry as to the truth of the matter set forth in the charges, consideration of the form of charges, and a recommendation as to the disposition which should be made of the case in the interest of justice and discipline.

accommodate the approximately 100 journalists from the print and broadcast media who were covering the proceeding.  The Air Force also set up a publicly accessible web site containing information about the incident. During the Article 32 hearing, the prosecution approached Major Schmidt and his counsel regarding an alternative disposition of the case.  Major Schmidt declined.  According to Colonel John Odom, the lead prosecutor in the court-martial case, during the Article 32 investigation Major Schmidt's civil attorney, Charles Gittins, made numerous public statements on behalf of Major Schmidt, including conducting daily press briefings at which he discussed the day's proceedings and the defense's positions. Defendant's Motion for Summary Judgment, Govt Ex. 3, Declaration of John S. Odom (Odom Dec.), ¶ 5.  In Odom's opinion, Gittins' comments were designed to portray Major Schmidt as a victim in the incident.  Id.

In March 2003, the Article 32 Investigating Officer submitted his report to the Commander of the Eighth Air Force, General Bruce Carlson, recommending that the criminal charges against Major Schmidt and Major Umbach be dismissed.  See Plaintiff's Reply Brief in Support of Cross-Motion for Summary Judgment (d/e 16), Pl. Ex. 17.  General Carlson determined that the charges should be disposed of through the non-judicial

punishment procedures set out in Article 15 of the UCMJ.  See 10 U.S.C. § 815.  On June 19, 2003, Major Umbach received a letter of reprimand from General Carlson.  The text of Major Umbach's letter of reprimand was not released to the public or posted on the Eighth Air Force Tarnak Farms' website.  See Reply in Support of Defendant United States Air Force's Motion for Summary Judgment (Doc. 6), and Response, in Opposition to Plaintiff Schmidt's Motion for Summary Judgment (Doc. 8) (d/e 15) (Government's Reply/Response), p. 8 (admitting Undisputed Material Fact No. 8 from Plaintiff's Cross-Motion for Summary Judgment).  Also in June 2003, General Carlson offered Major Schmidt the opportunity to dispose of his case in an Article 15 administrative proceeding for dereliction of duty. Major Schmidt again declined non-judicial punishment and demanded trial by court-martial.

After approximately one year of additional proceedings, Colonel Odom informed Lieutenant Colonel Moushon that the Air Force was still amendable to disposing of the charges without a trial.  Lieutenant Colonel Moushon proposed a resolution that involved an administrative letter of reprimand, rather than non-judicial punishment under Article 15, and a joint press release announcing the settlement.  Odom Dec., ¶ 8.  According

to Colonel Odom, the Air Force would only approve a negotiated disposition if it involved non-judicial punishment.  Colonel Odom offered to reinstate the opportunity to dispose of the case in an Article 15 proceeding for dereliction of duty.   Colonel Odom asserts that he further informed Lieutenant Colonel Moushon that the Air Force would not consider a joint press release, but that they could discuss the contents of the Air Force's press release. Id.  Lieutenant Colonel Moushon communicated this offer to Major Schmidt.

According to Lieutenant Colonel Moushon, Major Schmidt was not adverse to disposing of the case in an Article 15 proceeding as long as certain conditions were met.  Plaintiff's Response to Motion for Summary Judgment (d/e 7), Pl. Ex. 2, Declaration of Lieutenant Colonel Clayton W. Moushon (Moushon Dec.), ¶ 7.  Moushon avers that the terms upon which Major Schmidt would agree to a disposition by non-judicial punishment were as follows: (1) Major Schmidt would agree to accept non-judicial proceedings as offered in June 2003; (2) at the completion of the non-judicial proceedings, the court-martial charges would be dismissed with prejudice; (3) Major Schmidt would execute a Letter of Intent to accept a non-flying position in the Illinois Air National Guard; (4) the Convening

6

Authority would execute a letter to U.S. Air Force Headquarters, confirming the essential terms of the agreement; and (5) the Convening Authority would not take any action to withdraw Major Schmidt's federal recognition. Id.  Major Schmidt acknowledges that his initial offer for non-judicial punishment contained these terms.  Plaintiff's Response to Motion for Summary Judgment (d/e 7), Pl. Ex. 3, Declaration of Major Harry M. Schmidt (Schmidt Dec.), ¶ 17.

At some point in June 2004, Major Schmidt formally requested that General Carlson allow him to change his decision to proceed to court-martial and to accept Article 15 punishment.  General Carlson granted Schmidt's request.  At that point, the Public Affairs office issued a press release.  Defendant's Motion for Summary Judgment, Govt Ex. 7, Declaration of Major Denise A. Kerr (Kerr Dec.), ¶ 7.  Major Denise Kerr, the Chief of Public Affairs for Headquarters Eighth Air Force, asserts that the Public Affairs office "did not receive a significant number of inquiries" after this press release.  Id.  Kerr believes that this was due to the fact that, first, the Public Affairs office had already provided the press with a thorough explanation of the non-judicial punishment process and, second, the press release announced only that the non-judicial proceedings would commence.

Id.

The parties' accounts of what transpired next differ.  According to Colonel Odom, the counterproposal that he presented to Lieutenant Colonel Moushon did not mention a press release.  Odom Dec., ¶ 9.  Odom asserts that there were no further discussions regarding a press release, although he does not identify a time frame.  Id.  Odom contends that at no time was he aware that Major Schmidt would not accept non-judicial punishment if the resolution was to be made public, either in whole or in part.  Id.

According to Major Schmidt, the Air Force's initial offer for alternative disposition included a waiver by Schmidt of his rights under the Privacy Act as it related to a press release regarding the Tarnak Farms' case.  Schmidt Dec., ¶ 18.  Schmidt asserts that he was uncomfortable giving the Air Force complete control over press releases in his case because he feared that the Air Force's press releases would be biased in an effort to place full responsibility for the Tarnak Farms' incident on Schmidt.  Id.  Schmidt avers that he discussed this concern with Lieutenant Colonel Moushon and requested that the settlement contain provisions for a joint press release.  Id.

According to Lieutenant Colonel Moushon, in negotiating the

settlement, Lieutenant Colonel Moushon and Colonel Odom discussed how the settlement would be announced to the public.  Moushon Dec., ¶ 8. Moushon asserts that the men "agreed that a 'joint' press release would be in the best interest of both parties."  Id.  According to Moushon, "[i]n order to release a statement to the press relating to the settlement of the case, it would be necessary for Maj Schmidt to make a partial waiver of his rights under the Privacy Act."  Id.  Colonel Odom forwarded Lieutenant Colonel Moushon a draft proposal that contained an unconditional waiver of Schmidt's rights under the Privacy Act.  Colonel Odom informed Moushon that an unconditional waiver was required for two reasons.  Id.  First, Odom was concerned that Mr. Gittins would make a press release claiming that the settlement agreement included more than it actually provided.  In that event, the Government would not be able to contradict Gittins' statements unless it could release the terms of the settlement agreement.  Secondly, Odom expressed concern that Air Force regulations would prohibit release of information to the victims and their families.  Id.

Lieutenant Colonel Moushon asserts that he understood Colonel Odom's concerns, but disagreed with Odom's opinion that an unconditional waiver of the Privacy Act was required.  Moushon Dec., ¶ 9.  Moushon

informed Odom that Major Schmidt would be willing to execute "a partial waiver of the Privacy Act to allow the Government to confirm the terms of the settlement agreement only in a press release." Id. According to Moushon, Odom asked him to draft the proposed partial waiver, which Moushon did. Moushon drafted settlement documents which included a Memorandum from Major Schmidt. The Memorandum included the following proposed partial waiver of the Privacy Act: "I hereby waive my rights under the Privacy Act as it relates to a joint press release regarding the Tarnak Farms case." Id. Moushon believed that a joint press release would prevent either party from slanting the terms of the settlement agreement or adding their own spin to the settlement. Id. Moushon asserts that he and Colonel Odom agreed that this would be an acceptable resolution. Id.

Lieutenant Colonel Moushon asserts that, after he forwarded the proposed settlement to Colonel Odom, he received a telephone call from Odom, who stated that the concept of a joint press release was not acceptable to the Air Force. Moushon Dec., ¶ 10. Moushon asked Colonel Odom to clarify this position so that Moushon could pass it along to Major Schmidt. On June 21, 2004, Colonel Odom sent an e-mail to Lieutenant Colonel Moushon regarding the settlement discussions. Plaintiff's Response

to Motion for Summary Judgment, Pl. Ex. 1.  With respect to a press release, Odom's e-mail stated as follows:

> Finally, the USAF can't agree to do a joint press release.  We can certainly work together on the wording, but the AF is going to release a brief statement and cannot agree to do it jointly with the defense.  All it will say is that Maj Schmidt requested that the Convening Authority allow him to reconsider his earlier rejection of nonjudicial punishment, the C/A had agreed to allow such action by Maj Schmidt, Art. 15 punishment was imposed and Maj Schmidt's future duties with the IL ANG [Illinois Air National Guard] will not involve flying aircraft for the remainder of his career.

Id., ¶ 3.  The e-mail further provided as follows: "The only requested changes [sic] to Maj Schmidt's memo . . . is to strike the word 'joint' from para 4 concerning the press release.  The revised Schmidt memo is attached."  Id., ¶ 5; see also id., p. 5 (revised Schmidt Memorandum).

On June 22, 2004, Major Schmidt signed a document titled "Memorandum for Lt. Gen. Bruce Carlson."  Defendant's Motion for Summary Judgment, Govt Ex. 1.  The Memorandum detailed Major Schmidt's understanding that he would be assigned to a non-flying position for the remainder of his military service.  The Memorandum expressly stated as follows: "I hereby waive my rights under the Privacy Act as it relates to a press release announcing the conclusion of this case."  Id., ¶ 4.  This

language mirrored the language of the revised Schmidt Memorandum forwarded by Colonel Odom on the 21st. <u>Plaintiff's Response to Motion for Summary Judgment</u>, Pl. Ex. 1, p. 5, ¶ 4. According to Major Schmidt, Odom's June 21, 2004, e-mail regarding the information that would be released was a substantial factor in his decision to accept Article 15 punishment. <u>Schmidt Dec.</u>, ¶ 19. According to Schmidt, he specifically advised Lieutenant Colonel Moushon that he would not agree to a blanket waiver of his rights under the Privacy Act, and he at no time agreed to waive his Privacy Act rights with respect to his service record. <u>Id</u>. Lieutenant Colonel Moushon asserts that "[t]he statement regarding the information that would be released by the Air Force was a substantial factor in Major Schmidt's decision to accept resolution of the case by [non-judicial punishment]." <u>Moushon Dec.</u>, ¶ 11. According to Moushon, "Colonel Odom's representation as to the content of the post-resolution press release was the predicate for Major Schmidt agreeing to partial waiver of his rights under the Privacy Act." <u>Id</u>.

On June 24, 2004, the Air Force issued a press release relating to Schmidt's case. <u>Plaintiff's Response to Motion for Summary Judgment</u>, Pl. Ex. 16. The press release stated that Major Schmidt had requested to

resolve his case through non-judicial punishment, that General Carlson had allowed the request, and that non-judicial punishment proceedings would commence immediately.  Id.  According to Lieutenant Colonel Moushon, after the terms of the settlement had been approved by all parties and after the June 24, 2004, press release announcing the settlement of Schmidt's case, he received a telephone call from Colonel Odom, who stated that a new issue had arisen relating to the statute of limitations.  Moushon Dec., ¶ 14.  Moushon asserts that applicable regulations required non-judicial punishment to be administered within two years of the date of an offense. Moushon avers that Odom told him that this provision had been overlooked and asked that Schmidt sign a waiver of the statue of limitations for non-judicial punishment.  According to Moushon, he told Odom that Schmidt was not inclined to make any further waivers and, based on the language of the press release, Schmidt did not trust the Government to comply with the terms of the settlement agreement.  Id.  Eventually, however, Schmidt agreed to waive the statute of limitations, provided that the Government would execute a confirmation that it would strictly comply with the remaining provisions of the settlement agreement.  Id.; see also Plaintiff's Reply Brief in Support of Cross-Motion for Summary Judgment, Pl. Ex. 18,

<u>Addendum to Agreement for Alternative Disposition</u>.  On June 28, 2004, the Staff Judge Advocate, Eighth Air Force confirmed the acceptance of the settlement agreement.  <u>Schmidt Dec.</u>, ¶ 22; <u>Plaintiff's Reply Brief in Support of Cross-Motion for Summary Judgment</u>, Pl. Ex. 18, p. 2.

Major Schmidt's non-judicial punishment hearing was closed to the public.  On July 1, 2004, Major Schmidt made a personal presentation to General Carlson.  On July 5, 2004, General Carlson issued his decision imposing non-judicial punishment.  The text of the punishment is filed under seal in this case.  <u>Sealed Exhibits (d/e 13)</u>, Govt Ex. B.  After Carlson's decision was issued, and Schmidt was notified, the Public Affairs office issued another press release.  <u>Kerr Dec.</u>, ¶ 8.  The press release, dated July 6, 2004, is filed under seal in this case.  <u>Sealed Exhibits (d/e 13)</u>, Govt Ex. A.  It states that discipline had been imposed and quotes portions of General Carlson's decision.  <u>Id</u>.  Additionally, the complete text of the reprimand was placed on the Eighth Air Force's Tarnak Farms' web site.  <u>Moushon Dec.</u>, ¶ 21; <u>Schmidt Dec.</u>, ¶ 26.  This web site is available to the public.  <u>See</u> <u>Answer (d/e 4)</u>, p. 7, ¶ 51.

The Air Force asserts that an internal legal review was conducted prior to the disclosures at issue.  On June 18, 2003, the Air Force conducted a

legal review to determine the applicability of the Freedom of Information Act (FOIA) and the Privacy Act to requests for the Convening Authority's decisions in Major Schmidt and Major Umbach's cases. Defendant's Motion for Summary Judgment, Govt Ex. 4; see also 5 U.S.C. § 552 (FOIA); 5 U.S.C. § 552a (Privacy Act). The legal review was conducted by Major Michael Taylor, the Chief of Enlisted Actions and Civil Law in the Office of the Staff Judge Advocate, Eighth Air Force. As the Civil Law Chief, Taylor was involved in responding to FOIA requests and other media inquiries involving the Schmidt and Umbach cases. Defendant's Motion for Summary Judgment, Govt Ex. 5, Declaration of Major Michael W. Taylor (Taylor Dec.), ¶ 2. The legal review dealt expressly with the question of whether "a press release describing the outcomes, a letter of reprimand issued to Major William Umbach, and nonjudicial punishment offered to Major Harry Schmidt" were releasable under the FOIA. Defendant's Motion for Summary Judgment, Govt Ex. 4, ¶ 1. Taylor noted that the three documents in question were covered by the Privacy Act. However, Taylor concluded that the documents were nevertheless required to be disclosed under the FOIA because he found no applicable FOIA exemption. Id., ¶ 6. Specifically, Taylor noted that "the public's interest in holding the

officers accountable and deterring others from similar behavior outweighs the officers' privacy concerns." Id. Due to the expected level of interest, Taylor recommended that the documents be posted in a FOIA public reading room. Id. According to Taylor, his supervisor Brigadier General Richard C. Harding, Eighth Air Force Staff Judge Advocate, agreed with his conclusions and conveyed them to the FOIA office. Taylor Dec., ¶ 5. Taylor asserts that, "[i]n turn, the FOIA office released the requested materials." Id. According to Lieutenant Colonel Moushon, despite the fact that Schmidt's attorneys made multiple discovery requests for information relating to the release of information about Schmidt's case to the public, Major Taylor's June 18, 2003, Memorandum was never disclosed. Moushon Dec., ¶ 16.

Brigadier General Harding, the Staff Judge Advocate, asserts that he was aware that the Public Affairs office had received several standing requests for information about Major Schmidt's case. Defendant's Motion for Summary Judgment, Govt Ex. 6, Declaration of Brigadier General Richard C. Harding (Harding Dec.), ¶ 10. Harding believed that, under Air Force regulations, the Commander, through the Public Affairs office and with the advice of the Staff Judge Advocate, should provide media releasable

information without forcing representatives of the media to go through FOIA channels.  Id.  Therefore, during the time that General Carlson was considering what punishment he would impose under Article 15, Harding asked Taylor to review the releasability of information about the case.  Id., ¶ 11.

According to Taylor, the FOIA office did not receive any requests for information concerning the outcome of Major Schmidt's non-judicial punishment proceedings.  Taylor Dec., ¶ 7.  Taylor asserts, however, that he was aware that the Public Affairs office had received standing requests for information about the case.  Taylor believed that, under Air Force regulations, the Commander, through the Public Affairs office, should provide media releasable information without forcing representatives of the media to go through FOIA channels.  Id.  According to Taylor, his opinion remained that the FOIA required the release of this information as set forth in his June 2003, legal review.  Id., ¶ 8.  Taylor did not prepare another memorandum, but discussed the matter with Brigadier General Harding, who agreed with Taylor's position.  Harding further noted that a press release was permissible based on the fact that Schmidt "had executed an unconditional waiver of his rights under the Privacy Act as it related to a

17

press release announcing the conclusion of the military justice case."
<u>Harding Dec.</u>, ¶ 12.

After General Carlson determined Schmidt's punishment, Harding and Taylor "advised the Public Affairs office that a press release discussing the punishment General Carlson had imposed was permissible and assisted them in preparing it." <u>Taylor Dec.</u>, ¶ 8. Harding and Taylor also provided a copy of the full text of Major Schmidt's punishment to the Public Affairs office to be distributed to the media who had filed standing information requests in Schmidt's case and posted the text of the punishment on the web site that the Air Force maintained relating to the Tarnak Farms' incident. <u>Id</u>.; <u>Harding Dec.</u>, ¶ 13.

Major Schmidt asserts that the public release of his reprimand has caused him to be denied opportunities for post-military employment. In April 2006, Schmidt filed the instant Complaint. Schmidt claims that the Air Force violated the Privacy Act by disclosing information from his personnel records, specifically the text of his reprimand, on the Tarnak Farms' internet site (Count 1) and by providing information regarding the content of his reprimand to the press and to family members of the Canadian servicemembers (Count 2). By Text Order, dated January 9,

2007, the matter was transferred to this Judge.  The cross-motions for summary judgment are now fully briefed and ripe for determination.

## ANALYSIS

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact and that judgment as a matter of law is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  When a properly supported motion for summary judgment has been made, the party opposing summary judgment may not merely rest on the pleadings but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The Privacy Act prohibits federal agencies, including military departments, from disclosing an individual's "record" that is contained in a

"system of records" to another person without the consent of the individual
to whom the record pertains, subject to certain express exceptions.  See 5
U.S.C. § 552a(b).  Permissible nonconsensual disclosures include disclosures
required under the FOIA.  5 U.S.C. § 552a(b)(2).  If an agency improperly
discloses information that is protected under the Privacy Act in such a way
as to have an "adverse effect" on an individual, that individual may bring a
civil action against the agency.  5 U.S.C. § 552a(g)(1)(D).  If the Court
determines that the agency acted in an "intentional and willful" manner in
violating § 552a(g)(1)(D), the plaintiff is entitled to recover actual damages,
with a statutory minimum of $1,000.00, attorney's fees, and costs.   5
U.S.C. § 552a(g)(4).

A District Court in the Northern District of Illinois has identified the
"key elements of a cause of action under the Privacy Act for damages for
disclosure" as follows:

> (1) agency disclosure (by any means of communication); (2) to
> an individual or another agency; (3) of a "record" contained in
> a "system of records"; (4) which is unauthorized by the
> individual; (5) which is not within an exception; (6) an adverse
> effect on the individual, which contains two components (I) an
> adverse standing component and (ii) a casual nexus between the
> disclosure and the adverse effect; and (7) that the agency action
> be in a manner which was "intentional" or "willful."

20

<u>Carlson v. General Services Admin.</u>, 2006 WL 3409150, *3 (N.D. Ill. November 21, 2006).  Major Schmidt asserts that, given the undisputed evidence, he can establish all the requisite elements of his claims.  The Air Force asserts that Schmidt cannot establish the fourth and fifth elements.  Specifically, the Air Force contends that: (1) Major Schmidt waived his rights under the Privacy Act, and (2) the disclosures fell within a Privacy Act exception in that they were required under the FOIA.  The Court addresses each argument in turn.

A.    <u>WAIVER</u>

The Air Force asserts that the disclosure of Major Schmidt's reprimand fell within the scope of the Privacy Act waiver that Schmidt signed as a part of the negotiated settlement.  The Court disagrees.  The Memorandum signed by Major Schmidt provides: "I hereby waive my rights under the Privacy Act as it relates to a press release announcing the conclusion of this case."  <u>Defendant's Motion for Summary Judgment</u>, Govt Ex. 1, ¶ 4.  This waiver is expressly limited in scope to a press release announcing the conclusion of the case; it is not a blanket waiver of Schmidt's rights under the Privacy Act.  Indeed, Schmidt's waiver contrasts significantly with the example blanket Privacy Act waiver that is included in § 6.4.3.1 of Air Force

Instruction 35-101, which provides as follows:

> An example of a Privacy Act Release statement is: "I hereby authorize Air Force officials to disclose any information about me, whether or not protected by the Privacy Act, Freedom of Information Act, or any Air Force regulations or instructions, to (specific news organization or person) in response to (his/her) interest in my case.

<u>Defendant's Motion for Summary Judgment</u>, Govt Ex. 2, p. 113.

After General Carlson's decision was issued, the Public Affairs office issued a press release, dated July 6, 2004, stating that discipline had been imposed and quoting portions of the reprimand.  <u>Kerr Dec.</u>, ¶ 8; <u>Sealed Exhibits</u>, Govt Ex. A.  This disclosure arguably falls within the scope of Schmidt's Privacy Act waiver, but this is not the disclosure at issue in the instant case.  It is undisputed that, in addition to the July 6, 2004, press release, the complete text of the reprimand was placed on the Eighth Air Force's Tarnak Farms' web site, a web site that is available to the public, and provided to the families of the deceased and injured Canadians.  These are the disclosures that Schmidt challenges.   These disclosures cannot be characterized as "a press release announcing the conclusion of this case." <u>Defendant's Motion for Summary Judgment</u>, Govt Ex. 1, ¶ 4.  Thus, they do not fall within the scope of Schmidt's waiver such that they could be

considered to have been authorized by him.  The Air Force's first argument fails, and the Court turns to the question of whether the disclosures fell within an exception to the Privacy Act.

B.  <u>PRIVACY ACT EXCEPTION</u>

The only potentially applicable Privacy Act exception is found at 5 U.S.C. § 552a(b)(2), which allows for disclosure when disclosure of the record at issue would be required under the FOIA.  The Air Force asserts that the disclosures at issue in the instant case were required under the FOIA and, thus, exempt from Privacy Act protection.  The Court agrees.

As the Supreme Court has recognized, the FOIA was enacted with the general purpose of achieving full agency disclosure of official information unless such information is exempted under clearly delineated statutory language.  <u>Department of Air Force v. Rose</u>, 425 U.S. 352, 360-61 (1976). The FOIA generally requires an agency, upon receiving a proper request for records, to make the records promptly available to any person.  Subsection b of the FOIA contains nine express exemptions from disclosure.  Major Schmidt asserts that his reprimand was excluded from disclosure under 5 U.S.C. § 552(b)(6), which exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion

of personal privacy."

It is undisputed that Major Schmidt's reprimand is a part of his personnel record. Major Schmidt does not dispute the Air Force's assertion that there were continuing requests for information relating to his case. See Defendant's Motion for Summary Judgment, p. 13, Undisputed Material Fact No. 42; Plaintiff's Opposition to Defendant's Motion for Summary Judgment (d/e 7), p. 2-6, Responses to Defendant's Assertions of Undisputed Material Fact (failing to address Defendant's Undisputed Material Fact No. 42). Schmidt does not challenge the adequacy of these requests to trigger disclosure under the FOIA. Moreover, § 6.4.2 of Air Force Instruction 35-101 provides as follows:

> The commander, through public affairs and with the advice of the staff judge advocate, should provide media releasable information without forcing representatives of the news media representatives to go through FOIA channels. This requires the staff judge advocate to provide advice in a timely manner. Media representatives can request information under FOIA, completely bypassing public affairs. FOIA channels take longer than public affairs due to administrative procedures.

Defendant's Motion for Summary Judgment, Govt Ex. 2, p. 113. Thus, the Court turns to an analysis of whether the disclosures fell within the identified exception, i.e. whether the disclosures constitute a clearly

unwarranted invasion of personal privacy.

The Supreme Court addressed the sixth FOIA exemption in Department of the Air Force v. Rose, 425 U.S. 352.  The Rose Court noted that the FOIA did not create a blanket exemption for personnel records, but rather created a limited exemption requiring a balancing of interests.  Id. at 371-72.  As the Court concluded, "Exemption 6 does not protect against disclosure every incidental invasion of privacy only such disclosures as constitute 'clearly unwarranted' invasions of personal privacy."  Id. at 382.  The Court, in Rose, determined that the FOIA mandated the disclosure of case summaries of honors and ethics hearings from the United States Air Force Academy with personal references and identifying data deleted, noting that the redaction of identifying information satisfied the individual confidentiality concerns embodied in Exemption 6.  Id. at 380-81.

Rose is distinguishable from the instant case in that Schmidt's reprimand was released without the redaction of identifying information.  The underlying principles set forth in Rose, however, remain applicable.  In analyzing FOIA Exemption 6, the Court must "balance 'the individual's right of privacy' against the basic policy of opening 'agency action to the light of public scrutiny.'"  U.S. Dept. of State v. Ray, 502 U.S. 164, 175

(1991) (quoting Rose, 425 U.S. at 372).  The Supreme Court has instructed that "unless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail."  Id. at 177.  The Supreme Court has recognized on several occasions that:

> FOIA's "basic policy of 'full agency disclosure unless information is exempted under clearly delineated statutory language,' . . . focuses on the citizens' right to be informed about 'what their government is up to.' Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose."

Id. at 177-78 (quoting Department of Justice v. Reporters Comm., 489 U.S. 749, 773 (1989); Rose, 425 U.S. at 360-361).

The mostly closely analogous case to the instant one is Chang v. Department of Navy, 314 F.Supp.2d 35 (D. D.C. 2004).  Chang was the commander of a naval vessel that was involved in a collision with another ship.  Following the collision, Chang was relieved of his command and charged with negligent dereliction of duty.  The charges were ultimately resolved in a non-judicial punishment proceeding after which Chang received a punitive letter of reprimand.  Id. at 38.  The Navy subsequently disclosed the details of Chang's non-judicial punishment hearing and his letter of reprimand to the press and members of Congress.  Chang filed a

lawsuit alleging Privacy Act violations.

The <u>Chang</u> Court granted summary judgment in favor of the Navy. The Court noted that while an individual has a privacy interest in keeping employment history, job performance evaluations, and information as to disciplinary proceedings confidential, "[t]he public has a competing interest . . . in knowing the identities of disciplined government officials 'in order to hold the governors accountable to the governed.'" <u>Chang</u>, 314 F.Supp.2d at 43 (<u>quoting</u> <u>Stern v. F.B.I.</u>, 737 F.2d 84, 92 (D.C. Cir. 1984)).  The Court recognized that there was significant media attention to the collision and Chang was the vessel's commanding officer.  The Court determined that the public interest in the information outweighed any privacy interest.  The Court expressly rejected Chang's assertion that the public interest argument was weakened by the fact that the Navy withheld the names and specific punishments of all of the other officers who were punished as a result of the collision.  <u>Id</u>. at 44.  In doing so, the Court determined that Chang's position as commander of the ship justified the release of his identifying information.  <u>Id</u>.

The Eleventh Circuit examined FOIA Exemption 6 in a similar context in <u>Cochran v. United States</u>, 770 F.2d 949 (11th Cir. 1985).  Cochran, a

retired Major General in the United States Army, filed suit alleging Privacy

Act violations stemming from the Army's issuance of a press release

concerning a non-judicial punishment proceeding against him. Cochran was

charged with, and found guilty of, wrongful appropriation of a government

aircraft and diversion of governmental facilities and manpower. As

punishment, Cochran received a written reprimand and a $2,000.00 fine.

After the resolution, the Army issued a press release that briefly summarized

the outcome of the non-judicial proceedings and the punishment imposed

on Cochran. Id. at 951-52. Cochran asserted that this information was

protected from disclosure under FOIA Exemption 6. The Cochran Court

disagreed. The Court held that the public interest in disclosure of

information relating to a violation of the public trust by a government

official was overwhelming and outweighed Cochran's right to privacy. Id.

at 956. Thus, the Court found that no clearly unwarranted invasion of

privacy had occurred. Id. at 957. In a footnote, the Cochran Court

questioned whether current newsworthy information fell within the

strictures of the Privacy Act. Id. at 959 n.15. The Court noted that the

legislative history of the Privacy Act indicates a primary concern with the

protection against the release of stale personal information contained in

government computer files.  Id.  Given its resolution, however, the Court did not need to decide this issue.  Id.

In the instant case, Schmidt had a privacy interest in keeping the information about his discipline confidential.  Also, as Schmidt points out, he was not a senior military official, but rather a major who was the junior officer in the April 17, 2002, mission.  However, the competing public interest in disclosure clearly outweighs Schmidt's privacy interest.  It is undisputed that the friendly-fire incident garnered significant public and media attention.  It was a deadly incident, with international effects.  Schmidt's punishment did not arise out of Schmidt's private conduct, but rather related to acts that Schmidt took in carrying out his employment.  The release of Schmidt's reprimand gave the public, in the United States and around the world, insight into the way in which the United States government was holding its pilot accountable.  Thus, considering all of the circumstances, the disclosures at issue were clearly warranted.

Schmidt points to several claimed violations of Air Force instructions and regulations. The evidence submitted by Schmidt reveals that, after the terrorist attacks of September 11, 2001, the Department of Defense added increased scrutiny to its policies regarding the release of private information

relating to servicemembers. Schmidt claims that the disclosures at issue violated both newly enacted and longstanding regulations. The Court notes that several of the regulations which Schmidt cites were not in force at the time the disclosures at issue here were made; however, the Court need not parse through his arguments. Even if Schmidt is correct that violations of Air Force instructions and regulations occurred, the Privacy Act does not create a civil remedy for violations of Air Force instructions and regulations. Schmidt characterizes security and information policy changes within the Department of Defense as a "sea change," but he fails to address the fact that the applicable statutes, the Privacy Act and FOIA, remained unchanged. Schmidt fails to establish that any of the claimed violations of Air Force instructions or regulations resulted in an actionable violation of the Privacy Act.

Schmidt also highlights the fact that Major Umbach's letter of reprimand was not released by the Air Force, despite the fact that Umbach was Schmidt's superior, and the Air Force did not redact Schmidt's identifying information before releasing the text of his reprimand. The mere fact that the Air Force did not release Umbach's letter of reprimand, without more, is irrelevant to the question of its releasability. While the fact that

Umbach's letter was not released could be a factor in determining the strength of public interest, it is undisputed that Schmidt and Umbach had very different roles in the friendly-fire incident. In light of Major Schmidt's role in the incident, public interest in the disclosure of his discipline is great. For the same reason, the Court finds that the release of Schmidt's identifying information was justified. There were only two individuals charged following the friendly-fire incident, and their identities were known to the public. While Major Schmidt was not the flight leader during the mission, it was Schmidt who made the decision to drop the bomb, and it was he who in fact dropped the bomb.

THEREFORE, for the reasons set forth above, Defendant's Motion for Summary Judgment (d/e 6) is ALLOWED, and Plaintiff's Cross-Motion for Summary Judgment (d/e 8) is DENIED. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   September 20, 2007

FOR THE COURT:

_____  s/  Jeanne E. Scott  _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE